In the Matter of the Application of HARRY LIEBOWITZ, Petitioner, for an Order of Mandamus against SIGMUND S. GOLDWATER, Commissioner of Hospitals of the City of New York, Respondent.

Supreme Court, Special Term, New York County, November 13, 1936.

*Field & Field* [*Reginald Field* of counsel], for the petitioner.

*Paul Windels, Corporation Counsel* [*Jeremiah M. Evarts* of counsel], for the respondent.

PECORA, J.   The petitioner, a suspended civil service employee, makes an application for an order of mandamus under section 31-b of the Civil Service Law, to be restored to duty in his position of architectural draftsman, grade 4, in the department of hospitals.

On the 1st day of May, 1934, he was suspended from that position under the provisions of section 31 of the Civil Service Law because of lack of work, and since that time has remained on the preferred list for reappointment.   He questions the good faith of the suspension for lack of work, by alleging that the work in which he was engaged is being carried on by a group of relief workers who are performing duties which had been requisitioned for many years prior thereto by the superintendent of institutions under the department of hospitals.   That work which these relief workers are doing, and in which petitioner claims they are illegally supplanting him, consists of the making of improvements, repairs, alterations and additions to the twenty-six city institutions in connection with which the petitioner performed duties as a civil service employee prior to his suspension.   The answer denies that relief workers are replacing the petitioner in the kind of work he was doing, and presents the separate defense that section 31-b, under which he seeks reinstatement, is unconstitutional on the ground that it violates article VIII, section 10, and article XII, section 3, of the State Constitution.

Section 31-b reads as follows: "Any person whose name has been placed on a preferred list since the first day of January, nineteen hundred thirty-four, or hereafter, as provided by section thirty-one of this chapter may maintain a mandamus proceeding for his reinstatement to the position from which he was separated or suspended, where it is shown that another person not appointed in accordance with the provisions of this chapter is employed in the same or a similar position, or assigned to or permitted to perform substantially similar duties or services theretofore performed by any such suspended employee. The fact that a person on 'work relief' is performing such duties or services, or the failure of the State or any civil division thereof, or city to provide funds for the continuance of the regular position by budget appropriation or otherwise shall not deprive such person on a preferred list of his right to reinstatement as provided herein."

The respondent contends that article VIII, section 10, would be violated by the reinstatement of petitioner under section 31-b, in that such reinstatement would result in making a gift of money to the petitioner, because (1) there is no budget appropriation for the position, and (2) no services can be performed by him, inasmuch as an outside agency — the Works Progress Administration — is doing the work previously performed by the petitioner. The same defense is virtually involved in connection with the alleged unconstitutionality of section 31-b under article XII, section 3, of the Constitution.

Petitioner's suspension and placement on the preferred list were in pursuance of section 31 of the Civil Service Law, which has been the subject of so much litigation in recent years. But in the instant case the usual question of alleged preferences to other civil service employees of lesser seniority is not involved. Petitioner makes no complaint that any employee of his grade has received preferential treatment. Petitioner's grievance is that the 1934 Economy Act (Laws of 1934, chap. 178) has been violated in a disregard of section 16 of that law, which reads as follows: " No person shall be employed from any emergency relief rolls to perform the duties of any employee whose office shall have been eliminated or who shall have been discharged or suspended from employment pursuant to the provisions of this act."

It is well known that emergency relief rolls were established as a result of the depression, to give temporary employment to as many of the great army of unemployed as could be taken care of. The expense of this relief work was at first borne by the State and the municipality. In 1933 and 1934 emergency relief was largely financed by the Federal government in co-operation with the State

and local governments through the Emergency Relief Administration, the Federal government financing the major part of the expense. The nature of the temporary relief work and the character of the emergency which it was commendably designed to meet, made it necessary to provide by law for the exemption of relief workers from the provisions of the Civil Service Law. As these relief workers were generally paid under a smaller scale than civil service employees doing like work, the temptation to supplant regular employees by emergency employees for the sake of effecting economies, had to be avoided. The possibility of laying off regular public employees under section 31 on the ground of lack of work and engaging cheaper non-civil service labor in their place, had to be guarded against for the protection of the civil service system itself. This safeguard was provided by section 16 of the Economy Act, already quoted.

It is clear, therefore, that the emergency relief workers were in law and in practice intended to perform work outside of and beyond the regular performance of their duties by civil service employees. In 1935 the emergency relief work which had been allotted in a more or less unsystematic way was organized by Federal statute under the Works Progress Administration. The purpose of this organization was to provide projects, for the carrying out of which relief workers in the various localities could be employed, which projects would result in some permanent public or civic improvements, but which at the same time would not supplant normal local, State or Federal operations. That this was indeed the purpose of the Works Progress Administration, instead of its use as a means for financing some of the regular local or State functions, may be seen by a study of the official " Handbook of Procedures for State and District Works Progress Administration " which is a part of the record in this proceeding. Chapter VI, section 5, of the handbook clearly states that the object of the projects is not to interfere with normal employment. It reads as follows:

" Normal Governmental Operations Not Permitted as Work Projects. — Projects which would result in the transfer of the expense of normal governmental operations from sponsors to the Works Progress Administration are not eligible. Projects may not be conducted if their execution would result in displacement of regular employees of the sponsor or prevent the reemployment of persons previously employed. Applications may be submitted to the Works Progress Administration, however, for projects:

" 1. Providing for extra work in addition to that normally carried on by the governmental agency.

" 2. The addition of new activities.

"3. The enlargement or development of physical plant and facilities."

It is further provided by section 1 of chapter XII that persons assigned to work on projects must, so far as possible, have been certified by public relief agencies as eligible for relief at the time of certification. It is perfectly evident, therefore, that the prohibition contained in the Economy Act as to replacing civil service employees by persons from the emergency relief rolls, applies to workers employed on Works Progress Administration projects.

If these projects are extra and additional, and not normal and usual governmental operations, it cannot be said that the workers on those projects replace any regular public employees. An issue is raised by the answer on this point. Whether the petitioner has been replaced in the kind of work which the department of hospitals would normally undertake at this period, is a question of fact which can only be determined after a trial. It should be observed, in this connection, that what might be deemed a normal governmental operation at one period might not be considered such at another time when the city's finances might be pinched. Facts of this character must be determined from a consideration of all the circumstances, and cannot be resolved on affidavits.

But we still have to face the question raised by defendant's answer to the effect that there is no position open for the petitioner, because of the absence of a budgetary appropriation, and that the mandate of section 31-b of the Civil Service Law adopted in 1936 is ineffective because it is unconstitutional. It is claimed to direct the employment of a person who has been replaced by a Works Progress Administration worker, and, by implication, the payment of a salary or gratuity to him when there is nothing for him to do.

This answer, for the purpose of the pleading, assumes the truth of the petitioner's charge that he has been replaced by relief workers. It also anticipates a situation such as arose in *Matter of Danker* v. *Department of Health* (266 N. Y. 365). In that case a nurse's assistant in the department of health, who was a civil service employee, was suspended and her position abolished. In an application for a mandamus she charged that her work was being performed by three relief workers and the abolition of her position under the Economy Act was, therefore, illegal. An alternative mandamus was directed there, and the right to that relief was sustained in all the courts. But the Court of Appeals made this observation which none of the parties below had noted: "The reinstatement of the petitioner, however, does not follow as matter of course even if her petition sets forth the true facts, and for this reason. Her position has apparently been abolished

in the interest of economy authorized by the above legislation [the Economy Act]. There is no appropriation for the place and no money to pay her. She, therefore, could not be reinstated without showing that the position exists and that there is an appropriation to cover it. This question was not raised by counsel, and we refer to it merely as a matter of caution."

To meet the difficulty presented by the high court, and to give teeth to the prohibition contained in the Economy Act, the Legislature enacted section 31-b as chapter 386 of the Laws of 1936, effective May 2, 1936, which I have already quoted.

In his main defense respondent alleges that the work of the projects is performed by employees of Works Progress Administration under Federal supervision, and that the department of hospitals in respect to these Federal projects has " no control over the employees, the selection of the employees, the hours of work, the manner in which it is done, nor the quality of the work, all of the foregoing being subject to Federal supervision."

The implication drawn from this pleading, emphasized by the argument in respondent's brief, is that even if the project is of the nature which the city might normally perform, the work is actually being conducted by the Federal authorities, and the city can do nothing about interfering with that work. The answer thus relegates the petitioner to the same helpless position in which the petitioner in the *Danker* case found herself, in being told that unless there was an appropriation she could not compel her reinstatement. The respondent thus regards the work undertaken by the Works Progress Administration as absolutely independent and beyond the control of the city, by reason of which he argues that to obey the direction of section 31-b of the Civil Service Law would be to make a gift of moneys to the petitioner for doing nothing — beyond the control of the city, by reason of which he argues that to obey the direction of section 31-b of the Civil Service Law would be to make a gift of moneys to the petitioner for doing nothing — something which is prohibited by the Constitution.

This argument is convincingly answered by the facts. The handbook of the Works Progress Administration from which I have already quoted, and which, by stipulation, has been made a part of the record, utterly demolishes the stand taken by respondent. While neither of the briefs refers to any of the contents of the handbook, certain of its significant paragraphs completely refute the contention (1) that the Works Progress Administration project cannot be disturbed in any fashion whatsoever, even though the particular work in certain aspects violates the requirements of section 16 of the Economy Act, and (2) that the city is impotent

to do anything about it. Chapter VI, section 8 and section 10, and chapter X, section 7 and section 10, of the handbook, all bespeak a close co-operation, contribution of effort and auxiliary control over the personnel of the works projects by the city authorities. I will reproduce these sections without any comment, for they speak for themselves, but I have italicized some passages to draw particular attention to them.

" Chapter VI.

" Section 8. Contribution by Sponsors.— The cooperation of State and local governmental agencies is essential to the success of the program. It is expected that funds available for the Work Program will be supplemented by contributions from the sponsors of the various projects. *These contributions may take the form of* labor, equipment, materials, the use of land, buildings, and other facilities, transportation of materials and workers, *consulting engineering, architectural or other services,* cash, and land purchased specifically for the project. Land already owned by the sponsor may not be listed as a contribution. Sponsors' contributions will depend upon the nature of the project and upon the sponsors' financial ability. Contributions pledged by the sponsor shall be furnished promptly as the progress of the work requires.

" Section 10. Assistance to Sponsors in the Planning of Projects. —*It is the obligation and responsibility of sponsors to prepare plans, specifications,* and estimates for their projects. *Where they do not have sufficient personnel or means to do so, State or district offices of the Works Progress Administration are permitted to give such assistance as may be necessary and feasible.* However, in no case shall the Works Progress Administration assume responsibility for adequacy of design, specifications, or plans or the accuracy of engineering calculations. The payment of licenses, fees, permits, inspection charges, etc., must be assumed by sponsors.

" Chapter X.

" Section 7. Responsibility and Authority of Sponsors.— Sponsors are expected to contribute supervision, labor, materials, equipment, and other facilities necessary for the operation of projects. A large measure of direct responsibility devolves upon sponsors in the direction and operation of projects financed under this class. *Although sponsors may not be directly in control of labor furnished for a project by the Works Progress Administration every consideration shall be given to sponsors in assigning supervisors, foremen, and labor acceptable to them.* Likewise, complaints by sponsors concerning incompetent or otherwise undesirable personnel or unsatisfactory operations, materials, etc., shall be carefully considered and every

effort made to conduct a project under cordial relations as well as in an efficient manner.

" Section 10. Supervision.— *The direct supervision of projects should be assumed by sponsors to the maximum extent possible.* In the event that detailed supervision by sponsors is not practicable, necessary foremen and other supervisors may be furnished by the Works Progress Administration but they shall respect the responsibility of sponsors in matters pertaining to planning of work, sequence of operations, methods to be employed, interpretation of plans, specifications, etc. *When paid from W. P. A. funds, supervisory personnel shall be obtained as far as practicable from persons certified from the public relief rolls.* Only when competent, qualified persons are not so available, may non-relief persons be assigned. However, it shall be the duty of the Works Progress Administration to see that both sponsors' and W. P. A. supervisory personnel are competent and to take such steps as are necessary to effect this result."

If the work project does not duplicate any normal and immediately necessary operation of the municipality, taking all circumstances into consideration, then petitioner has no grievance. If, however, the project in part takes the place of necessary and immediate municipal work and displaces civil service employees who have been laid off, they should be put to work in that project in conformity with the direction of section 31-b of the Civil Service Law. There do not seem to be practical contractual or other difficulties in that direction. Section 31-b is not unconstitutional in its requirements. I cannot assume that it will be interpreted retroactively so as to come under the ban of the rule in *Matter of Mullane* v. *McKenzie* (269 N. Y. 369). That case, it should be noted, upheld the 1935 amendment to section 23 of the Civil Service Law, which gave to an unlawfully removed civil service employee compensation for the period he was unlawfully kept out less the amount he earned elsewhere. It only condemned an application of it retroactively. But here there is no reason to suppose that any attempt will be made to apply section 31-b retroactively to a period prior to its passage. If the facts found upon the trial of the alternative order of mandamus show a replacement of the petitioner by the Works Progress Administration workers, in what should be a normally conducted municipal operation, petitioner will be entitled to relief under section 31-b of the Civil Service Law.

Motion for an alternative mandamus is granted. Settle order.