In the Matter of the Application of HARRY LIEBOWITZ, Petitioner, for an Order of Mandamus against SIGMUND S. GOLDWATER, M. D., Commissioner of Hospitals of the City of New York, Respondent.

Supreme Court, Trial Term, New York County, November 1, 1940.

*Field & Field* [*Reginald Field* of counsel], for the petitioner.

*William C. Chanler, Corporation Counsel* [*Jeremiah M. Evarts* and *Thomas W. A. Crowe* of counsel], for the respondent.

PECORA, J. The issues presented by the return to the alternative order of mandamus heretofore granted have been submitted to the court for decision upon an agreed statement of facts.

The application for the mandamus order was granted by this court (161 Misc. 115). Petitioner had been suspended on May 1, 1934, for reasons of economy, from the competitive position of architectural draftsman, grade 4, and his name placed on a preferred list in accordance with the provisions of section 31 of the Civil Service Law. In the spring of 1936 the Legislature added section 31-b to the Civil Service Law (Laws of 1936, chap. 386). That section provides that a person whose name has been placed on a preferred list pursuant to section 31 of the Civil Service Law may maintain a mandamus proceeding for reinstatement on showing that another person not appointed in accordance with the provisions of the Civil Service Law " is employed in the same or a similar position, or assigned to or permitted to perform substantially similar duties or services theretofore performed by any such suspended employee." The section expressly states that the right to reinstatement shall not be affected, either by the fact that the duties or services are being performed by a person on " work relief," or by the failure to provide funds for the continuance of the regular position " by budget appropriation or otherwise." Theretofore the only statute bearing on the employment of persons on relief was the 1934 Economy Act (Laws of 1934, chap. 178), which forbade the employment of any person, from emergency relief rolls, to perform the duties of any employee whose office had been eliminated, or who had been discharged or suspended from employment pursuant to that act. Shortly after the enactment of section 31-b of the Civil Service Law, petitioner applied for reinstatement thereunder, contending that services and duties substantially similar to those previously performed by him were being carried on by persons " on work relief," viz., employees of W. P. A.

As the opinion heretofore filed indicates, the court construed section 31-b as conferring a right to reinstatement only where the work performed by a person on " work relief " was such that it would normally have been undertaken by the city, at the time in question, regardless of whether or not relief funds were available to pay therefor, or persons on relief in existence to do it. To so-called " made work," i. e., work which would not ordinarily have been engaged in by the city, but which was authorized solely for the purpose of giving employment to relief workers outside of and beyond the scope of the regular duties of civil service employees, the statute was held not to apply. Thus construed, section 31-b was held to be constitutional, notwithstanding the claim that it violated the State Constitution in requiring the city to pay salary to an unnecessary employee and thereby confer upon him a gift or gratuity. In its trial memorandum, the city in effect concedes

that section 31-b is constitutional, if it be interpreted as requiring reinstatement of a civil service employee from a preferred list *only* in a case where the projects upon which relief workers are engaged would, but for the appropriation of relief funds and the existence of persons on relief, have been undertaken by the city through its regular civil service employees. In such a case, the relief workers are in reality replacing civil service employees, contrary, not only to the legislative intent, as expressed in section 16 of the Economy Act and section 31-b of the Civil Service Law, but also counter to the avowed design of W. P. A. not to engage in " projects which would result in the transfer of the expense of normal governmental operations from sponsors to the Works Progress Administration," or projects whose execution " would result in displacement of regular employees of the sponsor or prevent the reemployment of persons previously employed." (Official Handbook of Procedures for State and District Works Progress Administrations, chap. VI, § 5.) Where, however, the city in good faith, taking into consideration its financial condition and credit and the non-essential character of the work, determines not to undertake certain projects itself out of its own funds, an interpretation of section 31-b which would nevertheless compel it to reinstate suspended employees and pay them salaries for doing nothing, merely because relief workers paid out of Federal government funds are engaging in such projects as a form of work relief, would doubtless render it unconstitutional.

Having concluded that section 31-b may be successfully invoked by petitioner, only if the work performed by W. P. A. architectural draftsmen was such that it would have been undertaken by the city through its regular civil service employees but for the allotment of W. P. A. funds and the existence of relief rolls, the court directed a trial for the purpose of determining whether the W. P. A. draftsmen were in fact engaged in " made work," as the city contended, or in activities and projects which the municipality would in the usual and normal course have authorized out of its own funds. It is upon this issue that the parties have submitted an agreed statement of facts.

At the very outset it should be observed that on December 9, 1936, petitioner was appointed to the position of architectural draftsman, grade 4, in the department of sanitation, at a salary at least equal to that he received at the time of his separation from the service. He has expressly waived all claim to salary after that date, and his application is merely for salary from May 27, 1936, the date he first demanded reinstatement, to December 9, 1936. Any technical objections which may exist to the granting of the

relief applied for, by reason of petitioner's acceptance of a position in another department, are expressly waived by the city.

A very important consideration in determining the issue presented is the financial condition of the city during the period to which this application relates. As the court has already observed (161 Misc. 115, 119): "What might be deemed a normal governmental operation at one period might not be considered such at another time when the city's finances might be pinched." The court can hardly fail to take judicial notice of the fact that the city of New York was in straitened financial circumstances, as a result of the depression which commenced in the fall of 1929, and that a policy of rigid economy was imperative throughout the period covered by the agreed statement of facts. The Legislature itself had more than once, beginning in 1932, declared the existence of an emergency in respect of the city's finances (Laws of 1932, chap. 637; Laws of 1934, chap. 178). Because of the difficulty which the city had experienced for some years in marketing its corporate stock, it had become necessary in January, 1932, for the Legislature to authorize the issuance of $200,000,000 of three- to five-year corporate stock notes. The board of estimate and apportionment had been obliged to rescind the unincumbered balance of authorized tax notes, corporate stock and serial bonds amounting to $141,889,383.59, of which $19,225,350.30 represented unincumbered balances in the department of hospitals. Prior to January 1, 1934, the entire amount of corporate stock notes authorized by the Legislature had been issued. It had become necessary early in 1934 to grant leaves of absence without pay to employees, including the petitioner, whose salaries were paid from corporate stock and tax note appropriations and not from taxes levied on real estate. On May 1, 1934, petitioner and seven other architectural draftsmen in the department of hospitals had to be laid off for lack of funds. In the interim the city had been obliged to enter into the so-called bankers' agreement, by the terms of which its power to levy taxes, as well as its borrowing power, was definitely restricted. A statute was enacted (Laws of 1933, chap. 831) which limited the total amount of taxes which could be levied on real estate for the years 1934 to 1937, inclusive, to $270,000,000 in each year, exclusive of the amount necessary for debt service. The agreement and the statute were adopted pursuant to a plan for the restoration and rehabilitation of the city's credit, embodied in a resolution of the board of estimate and apportionment dated September 28, 1933. By chapter 178 of the Laws of 1934 the Legislature conferred upon the city the power to reorganize its

governmental agencies, to fix the compensation of its employees, and to furlough the latter without pay.

The total assessed value of taxable realty and personalty fell from $19,977,095,815 in 1932 to $16,678,736,548 in 1936, a decline in the tax base of almost twenty per cent. Simultaneously the total bonded debt of the city increased from $2,127,845,572.51 on December 31, 1930, to $2,354,197,896.07 on December 31, 1936, an increase of more than ten per cent, despite the lowered tax base. The margin of $600,840,710.69, which existed in 1933 before the constitutional debt limit would be reached, declined constantly until the beginning of 1937 it was only $235,886,532.69. The budgets to be raised by general fund revenues and tax levy were reduced from $631,366,297.97 for 1932 to $552,041,842.56 for 1936 a cut of approximately fifteen per cent. It should also be noted that the budgets for the years 1934 to 1937, inclusive, included, as required by law, an appropriation of a reserve for due and uncollected taxes, the reserve for 1936 being $17,000,000.

The situation was so serious that in 1934 the legal requirement for a capital outlay budget was suspended until November 30, 1935, with the result that no capital outlay budget was adopted until the year 1936. Furloughs without pay and substantial salary reductions had to be resorted to, despite the paring of the budget, in order to bring the revenues from tax levy and the general fund up to the amount appropriated in the budget.

In the plight in which the city found itself during the period under discussion, it must be evident that to avoid catastrophe the most drastic measures of retrenchment became imperative, particularly since the necessity of providing funds for unemployment relief had made requisite the imposition of substantial emergency taxes. During the year 1936 over $70,000,000 in emergency taxes was raised for relief purposes. Under these circumstances it must be transparently clear that the city was compelled to limit its appropriations for normal functions, activities and purposes to those which were imperatively essential at the time and which could not well be foregone or even postponed.

With this background in mind, it is difficult to escape the conclusion that the services performed by W. P. A. draftsmen, upon the basis of which petitioner claims the right to reinstatement, constituted so-called " made work," which the municipality would not have undertaken had it been obliged to expend its own funds for the payment thereof, instead of availing itself of moneys supplied through the Federal government. Various facts referred to in the agreed statement confirm this view. 498 W. P. A. projects

were undertaken from August 1, 1935, when W. P. A. commenced operations, to May 12, 1937. Their estimated cost was $10,318,151.08, of which there had been actually expended up to April 17, 1937, the sum of $7,209,484.73. Most of this expenditure was made for miscellaneous renovating, such as painting, patching and demolition, miscellaneous trucking, road building, and some of it for alterations. The amount of this expenditure contrasts strikingly with the largest amount which the city had appropriated for repairs and replacements in the department of hospitals since 1930, including years preceding the financial emergency, viz., $800,000 in 1931. This great disparity is obviously due to the fact that the W. P. A. program, at least to a very large extent, involved work which the city would not ordinarily have undertaken at the time as a normal governmental operation. That the work performed in the department of hospitals was "made work," which the city would not have authorized out of its own funds, becomes even clearer when it is observed that the appropriations for repairs and replacements in the department of hospitals for the years 1936 and 1937, the first two years during which the budgets could have contemplated the existence of W. P. A. (W. P. A. had been created in May, 1935), were $500,000 each, an amount practically identical with the appropriation of $501,000 in the budget for 1935, and double or more than double the appropriations for the same purpose in the budgets for 1933 ($255,000) and 1934 ($212,000). Even the budgets for the years 1930, 1931 and 1932, which were prepared prior to the city's financial difficulties, carried appropriations of only $600,000, $800,000 and $750,000, respectively, for repairs and replacements in the department of hospitals. Had the appropriations for repairs and replacements in the department of hospitals for the years 1936 and 1937 been lower than those of previous years, it might perhaps be argued that this was an indication that the city was attempting to save money by having W. P. A. workers, at Federal expense, perform services which it would otherwise in its normal operations have authorized as essential despite its financial straits. The fact that the appropriations in question for the years 1936 and 1937 were as large as the appropriation for the year 1935, and were approximately double those for the years 1933 and 1934, constitutes, under the circumstances, strong evidence that the work upon which W. P. A. employees were engaged would not have been undertaken by the city if it had to be paid for out of the latter's own funds.

Of the 498 W. P. A. projects in the department of hospitals above referred to, only one had been requested by the department

of hospitals in the budget for the year 1934, none in the year 1935, and only eleven in the budget for the year 1936. The cost of the architectural drafting work involved in those of the requested projects which had been started at the time the agreed statement of facts was entered into was only $485, and the total cost of all the work performed on those projects only $118,947.15. The fact that the department of hospitals had not seen fit in its budgetary requests, including that for the year 1936, to ask for an appropriation for the work involved in the other 486 projects, is persuasive evidence that the department itself did not consider these 486 projects to be essential or necessary, though they might possibly be desirable.

Petitioner stresses the fact that the superintendents of the various institutions comprised within the department of hospitals requested appropriations each year considerably in excess of those asked by the department itself of the budget director. It does not appear to what extent the 486 W. P. A. projects above referred to involve work for which appropriations had been requested by the various institutional superintendents. The agreed statement of facts merely declares that "many" projects were of that chart acter. The requests of the superintendents for the year 1935 are not in existence, and although those for the years 1936 and 1937 are available, it is agreed that it is difficult, if not impossible, to determine from a comparison of them with the W. P. A. projects to what extent the requests and the projects relate to the same work. Even if it were assumed, however, that all or most of the W. P. A. projects relate to work for which appropriations had been requested in previous years by the various institutional super-intendents, the case made out by petitioner would be no stronger. It is the requests for appropriations made by the department itself which are important, not the *intra-departmental* requests made of, but disapproved by, the budget committee of the department. Even the department's requests of the budget director (which, as previously observed, embodied only 12 of the 498 W. P. A. projects, on which drafting services amounting to only $485 had been performed up to May 12, 1937) must yield to the judgment of the board of estimate and the board of aldermen as revealed in the appropriations actually authorized in the duly adopted budgets. That some of the work performed during the year 1936, and the early part of 1937, by W. P. A. employees may have been the subject of appropriation requests made by institutional heads within the department, and even by the department itself, is no indication that the city authorities in control of the budget would

have acquiesced in such requests and authorized appropriations for such work in the absence of W. P. A. funds and W. P. A. workmen. In fact the contrary is to be assumed, for a comparison of the requests made by the department of hospitals, and the amounts actually appropriated by the budget authorities for the years 1931 to 1937, reveals that the appropriations actually made were as low as twenty per cent of the departmental requests in 1931, and at no time more than half of the department's request. There is every reason to suppose that had there been no W. P. A., the budget authorities would have continued their practice of paring down the requests for appropriations presented by the department of hospitals.

There can be little doubt of the fact that the city authorities have acted in good faith in connection with the matters herein involved. Of the seven architectural draftsmen who were laid off at the same time as petitioner, three were reinstated during the same year and two others during the following two years, while another accepted a position in a different department. Petitioner himself was given a position in the department of sanitation in December, 1936, at a salary at least equal to that which he had previously received. Both in the city service generally and in the department of hospitals, the total number of city employees reached a new high in 1936, and the number of employees in the competitive class of the city service generally reached its highest level in 1936. The number of employees in the competitive class in the department of hospitals was higher in 1936 than in any year since 1933.

In the light of the foregoing, the court is constrained to hold that petitioner has not made out a valid case for reinstatement, and that he accordingly is not entitled to any salary for the period prior to December, 1936, when he accepted a position in the department of sanitation.

The objections interposed by the attorneys for petitioner to various portions of the agreed statement of facts and to an exhibit incorporated therein, in accordance with the right to object reserved by agreement of the parties, are overruled. The court finds that the work upon which the W. P. A. employees were engaged would not have been undertaken by the city, out of its own funds, and was authorized only by reason of the appropriation of Federal funds for the purpose of furnishing work relief.

The parties having indicated their desire that this court pass on all questions, both of law and of fact, involved in this case and make final disposition thereof, a final order is directed to issue in favor of the respondent. Settle order.